**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CONSOLIDATION COAL COMPANY,
                    *Petitioner,*

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR;
BILLY E. WASSON,
                    *Respondents.*

No. 98-1533

On Petition for Review of an Order of the
Benefits Review Board.
(97-801-BLA)

Argued: March 1, 1999

Decided: November 13, 2001

Before WIDENER and LUTTIG, Circuit Judges, and
Richard L. VOORHEES, United States District Judge
for the Western District of North Carolina,
sitting by designation.

_____

Petition denied by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Steele Mattingly, JACKSON & KELLY, Mor-
gantown, West Virginia, for Petitioner. Frederick Klein Muth, HENS-
LEY, MUTH, GARTON & HAYES, Bluefield, West Virginia, for
Respondents.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Consolidation Coal Company petitions for review of an award of benefits to the claimant, Billy Wasson, under the Black Lung Act, 30 U.S.C. § 901 et seq. We affirm. We note that the Director of Workers' Compensation Programs supported the claimant's position before the Board.

I

Having worked for 22 years in the coal mines and about 30 years in the industry, Wasson first applied for black lung disability benefits in April 1992. The Administrative Law Judge (ALJ) awarded benefits in February 1994 under §§ 20 C.F.R. § 718.202(a)(1) (x-ray evidence of pneumoconiosis) and (a)(4) (pneumoconiosis established by medical opinion). On review, the Benefits Review Board (the Board) vacated the award upon determining that the ALJ had improperly weighed physicians' opinions and because the ALJ had applied the true doubt rule to resolve conflicting x-ray evidence which rule had been in the interim abrogated by *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994). The Board vacated the ALJ's findings regarding causation of disability because the ALJ failed to consider Sixth Circuit law rather than that of this Circuit as well as the findings regarding exertional levels required to perform Wasson's usual job because the ALJ failed to consider or weigh contrary probative evidence. The Board affirmed the ALJ's findings that the claimant had established total respiratory disability by pulmonary function tests as provided in 20 C.F.R. § 718.204(c)(1) as this was not challenged on appeal.

On remand, the ALJ again found the x-ray evidence to be equally probative but concluded that without the benefit of the true doubt rule the claimant could not establish existence of pneumoconiosis by x-ray

under § 718.202(a)(1). However, on reconsideration of the medical opinions, the ALJ found that the claimant had met his burden of establishing coal worker's pneumoconiosis under § 718.202(a)(4) based on the medical report and the deposition of Dr. Rasmussen which together constituted a reasoned medical opinion. The ALJ also found that the claimant's total respiratory disability was caused in part by pneumoconiosis under the law of the Sixth Circuit as well as the Fourth Circuit. The ALJ awarded benefits a second time, the Benefits Review Board affirmed the award, and the employer has filed its petition for review.

## II

Applying the same standard as the Benefits Review Board, we review questions of law *de novo* while findings of fact are conclusive and must be affirmed if supported by substantial evidence in the record considered as a whole. *Thorn v. Itmann Coal Co.*, 3 F.3d 713, 718 (4th Cir. 1993); 33 U.S.C. § 921(b)(3), as incorporated by 30 U.S.C. § 932(a). Substantial evidence is sufficient relevant evidence that a reasonable mind might accept as adequate to support the conclusion. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Consolidation first asserts that the ALJ erred in using standardized reference values found in the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (AMA guides) to conclude that the result of the claimant's 1991 single breath diffusing capacity (DLCO)* study was abnormal. The DLCO test in question was obtained by Dr. Bercher and the actual test result of 19 was reported by Dr. Bercher to be 84% of a predicted value of 23. Although the claimant's actual test measurement of 19 was lower than his 28.1 measurement in a DLCO test obtained by Dr. Rasmussen in 1989, Dr. Bercher concluded that because the claimant's diffusing capacity was calculated to be 84% in both the 1989 and 1991 tests, the claimant's diffusing capacity remained unchanged and within normal limits. Dr. Rasmussen pointed out on deposition, however, that in the 1989 test, the laboratory used a higher predicted value of 33.4 to calculate the claimant's diffusing capacity of 84% (28.1 divided by

---

*DLCO is medical shorthand for carbon monoxide diffusing capacity of the lungs.

33.4 = 84%). Dr. Rasmussen questioned the lower predicted value used by Dr. Bercher's laboratory in the 1991 test, stating that he believed that the claimant's diffusing capacity on that test would be abnormal if a higher predicted value was used. Thus a controversy arose as to whether the claimant's actual performance on the 1991 test was within normal or abnormal range, i.e., whether the lower predicted value was in fact the appropriate or correct value against which to measure the claimant's test result.

The Board found that the parties were properly notified in advance that the ALJ would look to the AMA guides to resolve the conflict in the expert opinions with respect to whether the claimant's test result was normal or abnormal and that the parties were given an opportunity to respond as required under 29 C.F.R. § 18.45. The Board concluded that neither the employer nor the testing physician, Dr. Bercher, had demonstrated any unfairness or inaccuracy in the AMA guides, and thus the ALJ permissibly relied upon this neutral third source to resolve the conflict in the expert opinions.

The employer objects to the ALJ's use of the AMA guides and points to the statements in the record of Dr. Bercher, Dr. Castle, and Dr. Chillag that differences in equipment, variations in technique, altitude, and the population lead to inter-laboratory differences. These physicians stated generally that such differences make it inappropriate to use the predicted values in the AMA guides.

The AMA guides at issue provide reference (predicted) values for population based average results of single breath diffusing capacity testing. The guide takes into account the population based differences noted by the above physicians of sex, age, and height. Further, the AMA guides state that the values in the guides should be used when the DLCO test is performed under the particular laboratory conditions and following the procedures that are specified within the guide by the American Thoracic Society. The guide states that if the testing laboratory does not follow the conditions and procedures set forth by the American Thoracic Society, that laboratory should either develop and verify its own predicted equations or use an accepted and verified equation.

We agree with the Board that the employer had adequate notice yet offered no specific evidence to show that the use of the AMA guide

was unfair or inaccurate when applied to the case at hand. The evidence offered by the employer consisted of statements that, in general, the selected predicted value depends on such population based factors of age, sex, height as well as varying laboratory conditions and techniques which would make it is necessary for the laboratory to establish its own predicted values. These general statements are not contradicted by the claimant and are supported by the AMA guides. However, the record shows that the population based factors of sex, age, and height are accounted for in the AMA reference values, and neither Dr. Bercher nor the other physicians assert otherwise. Indeed it appears that the purpose of the AMA guides was to standardize the test as much as possible in order to prevent unfairness to claimants caused by population based and laboratory variables. While the employer has offered evidence to support that the reference values in the AMA guides may not be appropriate to use in every case, it fails to point us to specific evidence in the record of why they should not be used in this case. We thus find no error in the decision of the Board on this issue.

The employer next asserts that the record lacks substantial evidence to support the ALJ's findings and that the ALJ's weighing of the various expert opinions was partial and irrational. The ALJ accorded greater weight to the opinion of Dr. Rasmussen because he found it to be a reasoned opinion supported by objective tests, medical history and physical examination. On review of the record, we agree with the Board that there is substantial evidence to support the ALJ's decision which was neither partial nor irrational.

In his practice of pulmonary medicine, Dr. Rasmussen had examined some 24,000 to 25,000 coal miners, and the employer conceded on the record that he is an expert in his field. Dr. Rasmussen's opinion is supported by objective tests including chest x-ray showing the presence of pneumoconiosis, electrocardiogram, spirometry lung volumes, diffusing capacity studies, resting and exercise blood gas studies, physical examination, and appropriate consideration of the claimant's medical history and work history. Dr. Rasmussen stated that based on his examination and these tests, the claimant had a moderately severe degree of pulmonary impairment sufficient to render him totally disabled for performing his previous coal mine work. Based on his own studies and those of Dr. Bercher which he

reviewed, Dr. Rasmussen described the claimant's pulmonary impairment as having both obstructive and restrictive components, the restrictive impairment shown by significant impairment in gas exchange during exercise, which was significantly out of proportion to his airway obstruction. With respect to the effect of the claimant's cigarette smoking, Dr. Rasmussen stated that principally the effect of cigarette smoking is to produce airway obstruction and increased lung volumes, and that Dr. Bercher's study (showing decreased lung volume) clearly showed a "restrictive type disease which would not be typically the consequence of cigarette smoking since cigarette smoking would generally produce emphysema which would result in an increase in lung volume." Dr. Rasmussen also opined that "[c]oal dust is fully capable of producing emphysema and also concomitantly interstitial pulmonary fibrosis, so that you have a combination of both in an individual." Dr. Rasmussen further stated that "[m]ore often than not, coal miners have an excessive emphysema in contrast to an excessive interstitial fibrosis." Dr. Rasmussen agreed with the employer's experts that the claimant's 54 pack year smoking history was significant and sufficient to cause obstructive lung disease (emphysema) in a susceptible individual and that cigarette smoking is the primary cause of emphysema and obstructive lung disease in America. However, it was his opinion, based on all the evidence in this case, that the claimant did have evidence of restrictive disease and that his impaired pulmonary function was caused by a combination of his occupational pneumoconiosis from some 31 years of working in coal mines and some 27 years of two pack per day (54 pack year) cigarette smoking.

The Board found that on remand the ALJ considered all the relevant evidence and properly discredited or gave less weight to the opinions of the other physicians as follows. Dr. Vasudevan examined the claimant at the request of the Director, OWCP on May 10, 1991. It was his opinion that the claimant suffered from occupational pneumoconiosis and that the pneumoconiosis accounted for 50% of the claimant's respiratory disability, with the remaining 50% being due to suspected cardiovascular disease. While this is consistent with the award of benefits and Dr. Rasmussen's opinion, the ALJ found that Dr. Vasudevan failed to consider whether the claimant's history of cigarette smoking was a component of these abnormalities and it appeared that Dr. Vasudevan did not have an accurate understanding

of the claimant's smoking history. (Dr. Vasudevan recorded on history that claimant smoked 3/4 pack per day since 1951.) Thus the ALJ rejected Dr. Vasudevan's opinion as failing to constitute a reasoned medical opinion under § 718.202(a)(4).

The ALJ rejected the opinion of Dr. Fino as to the cause of the claimant's pulmonary impairment. Dr. Fino did not examine the claimant. Based on his review of the records, he concluded, like Dr. Bercher, that the claimant had obstructive pulmonary impairment but no restrictive pulmonary impairment. Dr. Fino stated that lung volumes were elevated and thus were inconsistent with fibrosis. Dr. Fino testified that coal mine dust induced lung disease is primarily evidenced by impairment in gas exchange rather than impairment in ventilatory capacity. Based on the decrease in the claimant's blood gases, Dr. Fino admitted that he believed there was some gas abnormality, but there was also a significant ventilatory abnormality, and that you had to put the two in perspective "when you are dealing with a normal diffusing capacity [DLCO]". Dr. Fino also stated that the first exercise blood gas study by Dr. Rasmussen showed a drop of pO2 with exercise, but the subsequent exercise blood gas studies by Dr. Bercher and Dr. Vasudevan "with comparable levels of exercise" showed no drop. He opined that coal worker's pneumoconiosis is an interstitial pulmonary condition which causes a fixed fibrotic abnormality which should cause a drop in pO2 on exercise all the time, while variability in the pO2 value with exercise would be consistent with obstructive lung disease due to cigarette smoking. Dr. Fino again pointed to normal diffusing capacity values (DLCO), stating that a "normal diffusing capacity rules out the presence of clinically significant pulmonary fibrosis [pneumoconiosis]."

First, as the ALJ pointed out, Dr. Fino's opinion that the intensity of exercise in the three blood gas studies was comparable is not supported by the record. In the first test by Dr. Rasmussen which showed impairment of gas exchange and significant hypoxia during exercise, the claimant walked on a treadmill in increasing increments of speed and grade for a total of 11 minutes and reached a maximum of 2.5 mph at 12% grade. Of the two subsequent blood gas studies that Dr. Fino referred to as comparable, the extent of exercise for Dr. Vasudevan's study was walking on a treadmill for five minutes and 55 seconds at a speed of 0.9 mph at a 0.5% grade. In Dr. Bercher's

test, the period of exercise was only 4 minutes and 15 seconds with no indication of speed or grade. In regard to this, Dr. Rasmussen stated that the impairment of gas exchange generally increases with increasing energy expenditure, and that certain other values recorded during the tests in question indicated that oxygen consumption was significantly lower in Dr. Vasudevan's study indicating that the claimant exercised at a much lower exercise level and for a much shorter duration than in Dr. Rasmussen's test. The record supports the ALJ's findings that the levels of exercise were in fact not comparable. And even if the intensity of exercise in the three blood gas studies could be found to be comparable, the record supports that Dr. Bercher's exercise blood gas test was inadequate. The ALJ pointed to Dr. Rasmussen's testimony that there is a distinct rise in the pO2 very promptly after exercise and that the Social Security Administration and the Department of Labor require the blood sample for exercise blood gas studies to be drawn during exercise. Dr. Rasmussen testified that Dr. Bercher's study was inadequate, and the employer concedes that Dr. Bercher's study did not conform to the requirements of 20 C.F.R. § 718.105(b) which requires that blood gas samples be drawn during exercise, and, to the extent that Dr. Bercher relied on this study, the employer admits that the ALJ correctly ruled the assessment worthy of lesser weight. Consolidation brief at 10, footnote 2. It follows that the ALJ correctly found that to the extent that Dr. Fino relied on this study to conclude that the claimant had no gas exchange impairment or restrictive disease, which the record shows he did, his opinion was not well reasoned.

In addition to the blood gas studies, the ALJ noted that Dr. Fino's opinion that the claimant had no restrictive/interstitial disease was based on the reasoning that the claimant's diffusing capacity values were normal and that normal diffusing capacity rules out the presence of clinically significant pulmonary fibrosis, and pneumoconiosis is an example of a pulmonary fibrosis. The ALJ found, however, that the claimant's diffusing capacity was in fact abnormal when measured against standardized reference values set forth by the American Medical Association for evaluating respiratory impairment. As stated above, the employee did not show that the use of the AMA guides in this case was unfair or incorrect.

The ALJ also rejected the opinion of Dr. Gregory Endres-Bercher. Dr. Bercher examined the claimant at the request of the employer on

October 22, 1991. His opinion was that the claimant had definite respiratory impairment, but the impairment was due only to his smoking. He based this opinion on his finding that the claimant "does not demonstrate the presence of a restrictive disorder on pulmonary function testing, which therefore precludes coal worker's pneumoconiosis as the etiology of his disability." Dr. Bercher stated that the claimant demonstrated hypoxemia (deficient oxygenation of the blood) with arterial blood-gas testing both at rest and exercise, but that blood gas findings were not specific as to etiology.

The ALJ found that Dr. Bercher's opinion that the claimant did not have pneumoconiosis and that his respiratory impairment was caused by cigarette smoking alone was less creditable and not a reasoned medical judgment because it was based at least in part, on the exercise blood gas study which was admittedly unreliable. Both Dr. Rasmussen and Dr. Fino stated, and it is uncontradicted in the record, that a blood gas study taken after exercise as opposed to during exercise or immediately after exercise has little or no probative value. Dr. Rasmussen and Dr. Fino testified that blood must be taken during the exercise or at least within 10-15 seconds of the exercise to give reliable results. In this case, Dr. Bercher's blood gas study which showed persistent but no increase in hypoxia with exercise was taken at some undocumented and unknown time after exercise. The ALJ also discredited Dr. Bercher's opinion that the claimant did not have pneumoconiosis because it was based on Dr. Bercher's opinion that the claimant's test for single breath diffusing capacity (DLCO) was normal, when in fact it was abnormal based on the more creditable testimony of Dr. Rasmussen and when measured against the AMA's standardized predicted values as discussed above.

The employer also offered the medical opinions of three other non-examining physicians — Dr. Shawn Chillag, Dr. James Castle, Dr. A. Dahhan. The ALJ found each of these opinions to be unreasoned because each was based on the same flawed test results upon which Dr. Bercher and Dr. Fino relied as discussed above. Again the record supports the ALJ's finding. Dr. Chillag stated that the normal diffusion capacity "indicates lack of an interstitial fibrotic process as is seen in pneumoconiosis." Dr. Castle likewise pointed to Dr. Rasmussen's exercise blood gas study that showed a fall in pO2 but stated that one of the later blood gas studies obtained "during exercise" was

"seen to increase" and that "[t]his is inconsistent with the findings one would expect with coal worker's pneumoconiosis, and "[c]learly, two of the studies were inconsistent with this finding." The ALJ found that Dr. Dahhan also relied on the same flawed blood gas tests when he found insufficient evidence of pneumoconiosis based in part on "alteration in the blood gas exchange mechanism that improved after exercise on two occasions . . . ."

There is substantial evidence in the record to support that the opinions of Doctors Bercher, Fino, Chillag, Castle, and Dahhan that the claimant did not have pneumoconiosis were based at least in part if not totally on either or both the unreliable blood gas test performed by Dr. Bercher and on a DLCO test performed by Dr. Bercher which was 57.9% and thus abnormal when compared with the standardized predicted value set forth by the American Medical Association. Thus there is substantial evidence to support the ALJ's finding that such opinions were not reasoned.

Finally, we find no merit in the employer's argument that the ALJ's analysis of conflicting evidence was partial or irrational. The employer asserts that the ALJ found, on his own and without the support of any medical opinion, that blood gas studies affirmatively "reveal" a restrictive lung impairment, and that such finding is erroneous. The record in this case does not support such an argument. The ALJ reviewed and weighed all the evidence and found the opinion of Dr. Rasmussen to be reasoned and creditable. There is substantial evidence to support this finding. Contrary to Doctors Bercher, Fino, Chillag, Castle, and Dahhan, Dr. Rasmussen did not rely on patently flawed or unreliable tests to support his medical opinion. Rather he considered all the evidence of record, including the reliability of such evidence, to reach his opinion.

### III

We agree with the Benefits Review Board that the ALJ made no error of law, that his findings of fact are supported by substantial evidence in the record as a whole, that the claimant has established the presence of occupational pneumoconiosis under § 718.202(a)(4), and that claimant's total disability is caused in part by pneumoconiosis under § 718.204(b)(c).

The petition for review is accordingly

*DENIED*.